**The STATE of Ohio, Appellee,**

**v.**

**RAMEY, Appellant.**

[Cite as *State v. Ramey* (1998), 129 Ohio App.3d 409.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970588.

Decided Aug. 14, 1998.

410

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*James Grey Wolf,* Cincinnati, for appellant.

---

GORMAN, Judge.

The defendant-appellant, Rudy L. Ramey, appeals from his conviction, following a no-contest plea, on the charge of driving under the influence of alcohol in violation of R.C. 4511.19(A)(3). In his single assignment of error, Ramey contends that the trial court erred by failing to grant his motion to suppress. Specifically, he argues that a citizen tip that his vehicle had been observed driving erratically, relayed over the police radio, lacked sufficient corroboration to justify the subsequent investigatory stop of his vehicle that led to his arrest. For the reasons that follow, we disagree and thus affirm the trial court.[1]

## I

The events precipitating the stop of Ramey's vehicle are essentially undisputed. Officer Tim Snyder of the Harrison Police Department was in his vehicle when he heard two different transmissions over the radio. The first transmission was a call-in by an Addyston police officer that a passerby had flagged him down to

---

1. We have *sua sponte* removed this case from the accelerated calendar.

report that a gold Honda with a certain license-plate number travelling along State Route 50 was "a possible DUI." The second transmission was a BOLO ("be on the lookout") radio transmission from the Hamilton County Communications Center relaying the message to all units. The BOLO transmission described the vehicle, its license-plate number, and the route that it was travelling, and stated that it was a "possible DUI."

Officer Snyder responded to the two transmissions by taking up a position on Harrison Avenue that he determined to be along the Honda's most likely route of travel. Soon he observed a vehicle matching the description and license-plate number of the Honda and fell in behind it, following the vehicle for approximately two minutes. He testified that within that short time span he did not personally observe any erratic driving by Ramey, the operator of the Honda. Nonetheless, Officer Snyder proceeded to make an investigatory stop of the vehicle based solely upon the radio transmissions.

According to Officer Snyder, after stopping the vehicle he approached the driver's side and immediately noticed a moderate smell of alcohol about Ramey. He also observed that he had "red, glassy eyes." Officer Snyder then proceeded to administer two psychomotor field-sobriety tests to Ramey outside the vehicle. In Officer Snyder's view, Ramey failed both tests. Officer Snyder then placed Ramey under arrest for driving while under the influence and transported him to the Harrison Police Department, where he was read his *Miranda* rights and given a breathalyzer test. The results of the test showed a blood-alcohol content of .209. During subsequent questioning, Ramey told Officer Snyder that he had been to the Cincinnati.Reds opening-day game and had imbibed four to five twelve-ounce beers.

## II

The sole issue is whether the investigatory stop of Ramey's vehicle was constitutionally permissible. As this court has previously noted, the police stop of a motor vehicle for investigation is a significant intrusion and must be justified within the meaning of the Fourth and Fourteenth Amendments to the United States Constitution. *State v. Oney* (Feb. 15, 1995), Hamilton App. Nos. C–940332 and C–940333, unreported, 1995 WL 59695; *State v. Leonhardt* (Sept. 25, 1996), Hamilton App. Nos. C–950193, C–950194, C–950258, and C–960259, unreported, 1996 WL 539787; *State v. Smith* (1996), 117 Ohio App.3d 278, 690 N.E.2d 567.[2]

---

2. It should be pointed out that the Ohio Supreme Court has determined that the protections afforded by Section 14, Article I of the Ohio Constitution are commensurate with those afforded by the Fourth Amendment to the federal Constitution. *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, 565 N.E.2d 1271, 1273, fn. 1, certiorari denied (1991), 501 U.S. 1220, 111 S.Ct. 2833, 115 L.Ed.2d 1002.

The burden of the state is to provide this justification by demonstrating that the police officer acted with "reasonable suspicion." *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 905–906. "Reasonable suspicion" is a term of art that is not " 'readily, or even usefully, reduced to a neat set of legal rules.' " *United States v. Sokolow* (1989), 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527, 544. The term connotes something less than probable cause, but something more than an "inchoate and unparticularized suspicion or 'hunch.' " *Terry, supra,* at 28, 88 S.Ct. at 1883, 20 L.Ed.2d at 910. As noted by Justice Brennan: "Action based merely on whatever may pique the curiosity of a particular officer is the antithesis of the objective standards requisite to reasonable conduct * * *." *Delaware v. Prouse* (1979), 440 U.S. 648, 654–655, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667–669 (Brennan, J., dissenting). In short, there must be " 'some minimal level of objective justification' " for the stop. *Id.,* quoting *INS v. Delgado* (1984), 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247, 255–256.

Whether the police acted with "reasonable suspicion" requires consideration of the totality of the circumstances. *United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628–629; *Sokolow, supra,* at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10. It is possible that even completely legal conduct might, under some circumstances, justify a reasonable suspicion that criminal activity is taking place. *Sokolow, supra,* at 9, 109 S.Ct. at 1586, 104 L.Ed.2d at 11, citing *Reid v. Georgia* (1980), 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890, 894–895. As the court noted in *Sokolow,* a "series of acts, each of them perhaps innocent," may nonetheless, when viewed together, give the police officer justification for conducting further investigation. *Id.* at 9, 109 S.Ct. at 1587, 104 L.Ed.2d at 11.

It must be kept in mind that the ultimate constitutional issue, provided there exists some objective level of individualized suspicion, is whether the warrantless investigatory stop is "reasonable" under the Fourth Amendment. In determining this issue, a court must weigh the level of intrusion against the state's interest in effectuating the stop. The enormous magnitude of the state's interest in preventing drunk driving cannot seriously be disputed. As noted by the United States Supreme Court in a case approving the police use of sobriety checkpoints:

"No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's road are legion. The anecdotal is confirmed by the statistical. 'Drunk drivers cause an annual death toll of over 25,000 and in the same time span cause nearly one million personal injuries and more than five

billion dollars in property damage.' 4 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment Sec. 10.8(d), p. 71 (2 ed.1987)." *Michigan Dept. of State Police v. Sitz* (1990), 496 U.S. 444, 451, 110 S.Ct. 2481, 2486, 110 L.Ed.2d 412, 421.

As stated by another court: "A motor vehicle in the hands of a drunk driver is an instrument of death. It is deadly, it threatens the safety of the public, and that threat must be eliminated as quickly as possible." *State v. Tucker* (1994), 19 Kan.App.2d 920, 927, 878 P.2d 855, 861.

■ Against the state's interest in eradicating drunk driving must be weighed the important individual interest in the driver's freedom of movement and privacy. Brief investigatory stops of motor vehicles based upon reasonable suspicion, however, are considered substantially less intrusive than other forms of seizures under the Fourth Amendment. They consist generally of stopping the vehicle and approaching the driver for the purpose either of asking questions or, in the case of a suspected DUI, more closely observing the driver's condition. Absent further evidence of criminal activity, the police are entitled to observe only what is in plain view and are not permitted to further search or detain the vehicle and/or its passengers. For this reason, such stops, while not sanctioned lightly, are perceived as relatively minimal intrusions upon the driver's Fourth Amendment freedoms.

■ In the present case, Officer Snyder responded to two police radio transmissions: the call-in by the Addyston police officer and the resulting BOLO transmission. The mere fact that the information relied upon by Officer Snyder was broadcast over the radio rather than experienced by him personally does not render it insufficient to create a reasonable suspicion. *Adams v. Williams* (1972), 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612. The Ohio Supreme Court has determined that a police radio broadcast is a sufficiently reliable source to provide even probable cause to make a full arrest, let alone reasonable suspicion to justify an investigatory stop. *State v. Fultz* (1968), 13 Ohio St.2d 79, 42 O.O.2d 259, 234 N.E.2d 593, certiorari denied (1968), 393 U.S. 854, 89 S.Ct. 95, 21 L.Ed.2d 123. As observed by the court in *Fultz*, police are entitled to use modern technological advances to alert fellow officers that criminal activity is afoot, and the police radio is one such advance. Accordingly, "information received on a police radio is in the nature of an official communication and ordinarily it must be considered as a trustworthy source of information." *Id.* at 81, 42 O.O.2d at 260, 234 N.E.2d at 594.

■ Furthermore, an investigatory stop may be justified even though the criminal activity was not first observed by a police officer, but, rather, by a citizen

who then relayed the information to the police in the form of a "tip." As the court stated in *Adams, supra:*

"Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response." *Id.* at 147, 92 S.Ct. at 1924, 32 L.Ed.2d at 617–618.

Even tips from anonymous sources, imparted in a clandestine and therefore suspicious manner, are not *per se* unreliable. *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527; *Alabama v. White* (1990), 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301. The classic example is the unidentified voice on the telephone, the caller refusing to give not only his or her name, but also the basis of the information. Although not *per se* unreliable, such tips, because of their questionable origin, must be corroborated by independent police work before they can justify an investigatory stop. *White, supra.*

Although Ramey argues that the tip which led to his arrest was "anonymous"— provided to the police by someone he refers to as a "phantom"—we strongly disagree. According to the Addyston police officer, a passerby "flagged" him down to tell him that he had seen the Honda being driven in such a manner that he or she believed the driver to be intoxicated. There is nothing even remotely anonymous, clandestine, or surreptitious about a citizen stopping a police officer on the street to report criminal activity. Simply because the record does not identify the passerby by name does not mean that the police officer did not obtain it or that the passerby was unwilling to give it. Nor is there any reason to assume that the police officer did not ask the passerby some questions about what he or she saw before broadcasting the report over the police radio.

In sum, this case belongs in the "citizen-informant" category of cases, which are treated quite differently from those involving anonymous tips. As this court has noted: "Information from ordinary citizens who have personally observed what appears to be criminal conduct carries with it an indicia of reliability and is presumed to be reliable." *Oney, supra.* In *Oney,* we held that a police officer was justified in making an investigatory stop based upon information imparted to him personally by restaurant employees who had observed the defendant operating his vehicle in the parking lot in a drunken manner. Although the police officer in *Oney* did not independently observe drunken behavior before making the stop, we held that, under the totality of the circumstances, the officer

possessed sufficient articulable facts to justify a reasonable suspicion that the defendant was intoxicated or otherwise impaired.

Further, this court has held that a police broadcast based upon a telephone call, rather than an in-person report, may provide sufficient justification for an investigatory stop when the information given over the telephone is sufficiently corroborated. *Leonhardt, supra.* In *Leonhardt,* there was sufficient corroboration when the police officer drove to the area identified by the caller and discovered a vehicle that was of the same type, bearing substantially the same license-plate number, and driven by a person of the same sex and race as the caller described. In the present case, Officer Snyder obtained similar corroboration, discovering a vehicle matching the description and bearing the exact license-plate number of the vehicle reported by the passerby to be travelling along the same route. Thus, even if the report had originated anonymously over the telephone, rather than in person, there would have been sufficient corroboration to have justified the stop under our holding in *Leonhardt.*

Concededly, in *Smith, supra,* a panel of this court reached a different result with respect to a telephone tip. In *Smith,* a majority of this court held that a police officer was not justified in stopping a vehicle that matched the vehicle described in an all-county, police radio broadcast. The broadcast originated from a motorist on the highway, presumably using modern cellular technology, who reported the reckless operation of the vehicle. Rather than focusing on the fact that the vehicle fit the description of the vehicle identified in the broadcast with respect to its model, year, out-of-state license plates, and passengers, the majority held that the stop was not justified because the police officer's observation of the vehicle weaving within the lines did not constitute, in the majority's view, "suspicious behavior" or "erratic driving." Although the majority in *Smith* cited *Leonhardt* for comparison, it did not explain how the two cases are reconcilable. In our view, they are not. Under *Leonhardt,* the discovery of a vehicle matching in several particulars the vehicle described in the radio broadcast should have been sufficient corroboration of the motorist's report, and the observation of weaving (whether within or without the lines) served only to further justify the stop.

 We hold, therefore, that the tip in this case originated from a citizen informant and that the record does not support Ramey's contention that the citizen was in any way acting to conceal his or her identity. Further, the citizen informant was clearly reporting what he or she had just witnessed as a passerby. Accordingly, we hold that this information, relayed over a police radio by a fellow officer, was presumptively reliable, and that Officer Snyder was therefore justified in making a brief investigatory stop of a vehicle bearing the same license plates, travelling along the same route, and being of the same make and color as

the reported vehicle. Based upon what he initially observed concerning Ramey's physical condition, Officer Snyder was then further justified in having Ramey exit from the vehicle and perform the field sobriety tests. Ramey's failure to perform these tests then more than adequately justified his arrest.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

HILDEBRANDT, J., concurs.

DOAN, P.J., concurs separately.

DOAN, Presiding Judge, concurring.

As a member of the majority in *Smith,* I write separately for the sole purpose of noting that *Smith* is distinguishable from the present case because *Smith* involved a truly anonymous call-in tip, and because in *Smith* the primary reason proffered by the police for the stop—the nominal weaving of the vehicle within the lines—appeared more pretextual than credible. In my view, the holding of *Smith* is controlled by its particular facts. *Oney, Leonhardt,* and this case state the general rule in determining whether the police possess the level of reasonable suspicion necessary to make a brief investigatory stop of a motor vehicle.