DECISION.
A Hamilton County grand jury indicted appellant Damon Gatewood on the following five counts: preparation of marijuana for sale in the vicinity of a school or juvenile; failure to comply with an order or signal of a police officer while operating a motor vehicle; vandalism; felonious assault; and inducing panic. Gatewood entered a no- contest plea to the drug charge. A jury found Gatewood guilty of failing to comply with an order or signal of a police officer while operating a vehicle, criminal damaging, which was a lesser-included offense of vandalism, and negligent assault, which was a lesser-included offense of felonious assault.
In his appeal, Gatewood raises six assignments of error, claiming that the trial court erred in (1) denying his motion to suppress; (2) overruling his challenge to what he characterizes as the state's racially motivated peremptory strike of an African-American juror; (3) imposing consecutive sentences; (4) convicting him despite insufficient evidence (also the gist of his sixth assignment); and (5) convicting him against the manifest weight of the evidence.
I. The Chase and Arrest
Gatewood's troubles began when a female informant went to a Cincinnati police station to report drug trafficking from a residence on McPherson Street. She met with Cincinnati Police Officer Dwayne Wilson and told him that a black man known as Damon was selling drugs from the residence. The informant described how the transactions occurred, provided a description of Damon and one of his cars, and told Wilson that Damon had a white girlfriend with blonde hair. As a result of the informant's report, Wilson watched the house on three occasions. The first time Wilson saw a man fitting the description of Damon engage in conduct that the informant had predicted. The third time Wilson watched the house, he saw the suspect, later identified as Gatewood, leave the house with a blonde-haired white woman. The woman entered a white automobile and Gatewood entered a gold Audi. The woman followed Gatewood's Audi, and Wilson followed the woman's car. Because Wilson was not in uniform, he called for an uniformed officer to stop Gatewood's Audi because of suspected drug dealing. Sergeant Michael Fern responded to the call.
Fern's cruiser faced Gatewood's car while Gatewood waited at a traffic light on the corner of Grand and Warsaw. Fern turned on the cruiser's overhead lights. As Gatewood pulled out, Fern executed a U-turn and maneuvered between Gatewood's Audi and the woman's white car. Fern activated his siren. Gatewood accelerated and turned to the right on Ring Place, a dead-end street. Wilson followed Gatewood and Fern to Ring Place. Seeing that Ring Place was a dead-end street, Fern called for assistance in case a foot pursuit ensued.
Fern and Wilson attempted to block Gatewood's car in the cul-de-sac. Fern left his cruiser, with his weapon drawn, yelled at Gatewood that he was under arrest, and ordered him to get out of his car. Gatewood responded by closing his windows and sunroof. He did not get out. Fern broke a window with the muzzle of his gun and attempted to unlock the door in order to drag Gatewood from the Audi.
Meanwhile, Wilson had also left his car with his gun drawn. Gatewood moved his car forward and hit Wilson's car. He then put his car in reverse, knocked Fern to the ground, and backed into the open door of Fern's cruiser. At this point, Wilson fired five shots at the Audi because he feared that Gatewood was going to drive over Fern. While on the ground, Fern heard the gunshots being fired. Struggling to stand, Fern saw the backup lights of Gatewood's car coming toward him and fired a shot that missed the car. Gatewood was then able to maneuver his car out of the cul-de- sac and sped away. Fern suffered a contusion to his left shoulder and received physical therapy for a month following the incident.
Police Officer Michael Brown saw Gatewood's car coming toward the cruiser in which he and his partner were sitting. His partner got out of the cruiser, and both officers drew their guns. Gatewood's car backed up and sped away, with Brown's cruiser in pursuit. Brown observed Gatewood's car speeding and running stop signs during the chase. Brown also observed Gatewood throw an object from his car into a dumpster. He broadcast that action and continued his pursuit. Brown also observed Gatewood throw, at a later point, what appeared to be a baggie. Eventually, Gatewood's tire blew and he was apprehended. The police found the baggie, which contained marijuana. Nothing was found in the dumpster.
Cincinnati Police Specialist Terry Cox talked to Gatewood at the district office where other officers had brought him. Cox read Gatewood his Miranda rights, and Gatewood agreed to talk to Cox. Although Gatewood did not want his statement taped, Cox surreptitiously taped the conversation with a small recorder he had placed in his pocket. According to Cox, Gatewood stated that he did not know why he had been pursued, that he had tried to get away from the officers, and that he did not have a driver's license.
II. A Citizen Informant's Tip Proves Reliable
In his first assignment, Gatewood challenges the trial court's denial of his motion to suppress, claiming that the police officers' reliance on a tip from a confidential informant failed to provide the requisite reasonable, articulable suspicion to stop him. A challenge to a stop requires a police officer to have only a reasonable, articulable suspicion that the person is involved in criminal activity.[1] The "reasonableness of official suspicion must be measured by what the officer knew before" the officer made the initial stop.[2] The determination of whether a particular stop was based on reasonable, articulable suspicion of criminal activity requires the state to produce evidence from which a court may independently review whether "the suspicion of criminal activity on which the officers acted was one that a reasonable and prudent officer would have formed."[3] And "even completely legal conduct might, under some circumstances, justify a reasonable suspicion that criminal activity is taking place."[4]
Where "the information possessed by the police before the stop stems solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the weight and reliability due the tip."[5] The analysis in this respect is "whether the tip itself has sufficient indicia of reliability to justify the investigative stop."[6]
In Maumee v. Weisner, the Ohio Supreme Court identified three types of informants: (1) the anonymous informant whose information requires independent police corroboration because an anonymous informant is "comparatively unreliable"[7]; (2) the known informant from whom the police have previously received reliable tips; and (3) the identified citizen informant, whose tip is generally afforded more reliability under certain circumstances.
Gatewood characterizes the informant in this case as a known informant. Apparently, this is because the informant had some minor criminal convictions. But we are convinced that the informant was an identified citizen informant. Wilson testified that the informant came to the police station and informed him that drugs were being sold from a house on McPherson Street. The fact that the informant had face-to-face contact with Wilson allowed the officer to identify her and removed her tip from the reliability concerns under the anonymous-informer category.[8] Wilson testified that he had had no previous contact with the informant and that the informant was not paid for the information she provided. These facts weigh against characterizing the informant as a "known informant."
The fact that we have defined the informant as a citizen informant, however, is only one element of the totality of the circumstances that must be considered in determining the reliability of her tip.[9] Other factors to consider, among the totality of the circumstances, are whether the informant's information was gained from her personal observation or was the result of a secondhand description, whether the informant had continued contact with the police, and what motivation prompted the tip.[10]
In this case, the informant went to the police station and talked face-to-face with Wilson. She told him that a black man named Damon was selling cocaine out of a house on the 900 block of McPherson Street. She told Wilson that the man had a white girlfriend with blonde hair. The informant also provided Wilson with the particular way that the suspect operated. According to the informant, Damon used two cars, and one car was a gold Audi. The suspect drove one car and kept his drugs in the second car. The informant said that the suspect would leave the residence, walk around the block, and either deposit crack cocaine in a car there or deposit it in the car in front of the address. According to the informant, the suspect would stay at the house for thirty to forty-five minutes, and, during that time, traffic going in and out of the house would be heavy. Wilson gave the informant his pager number to allow her to contact him.
Wilson went to McPherson Street to determine where he could set up an observation of the area. He subsequently received a page from the informant, who told him that the suspect was wearing a blue-jean jacket, a white T-shirt, and khaki pants. Wilson observed a black male dressed as the informant had described. The man stayed for thirty to forty-five minutes. Wilson observed the suspect walk to a car parked across the street and place something in the car, reach under the seat, lock the door, and walk down the street. He turned left. The officer lost him, which, according to Wilson, seemed to be consistent with the information that the suspect drove another car. The officer did not know, however, what the suspect put in the vehicle, and there was no testimony about any drug traffic observed by Wilson.
On another occasion, Wilson observed the suspect as he left the building, went to his car, put something in his pocket, and returned to the building. A week later, Wilson observed the Audi parked across the street from the house. The suspect left the house with a blonde-haired white woman. Instead of following the procedures Wilson had previously observed, the suspect left the residence in the Audi, followed by the woman in her car. It was at that point that Wilson radioed for assistance to stop the car.
Gatewood claims that the informant's information failed to demonstrate a reasonable, articulable suspicion of criminal activity. But we hold, under the totality of the circumstances, including the predicted movements of Gatewood, corroborated by Wilson, that there was a reasonable, articulable suspicion of illegal conduct to justify the stop of Gatewood's gold Audi when it left the house on McPherson Street. Thus, because the trial court did not err in overruling Gatewood's motion to suppress, we overrule his first assignment.
III. We Perceive No Batson Violation
In his second assignment, Gatewood argues that the trial court violated his equal- protection rights by allowing the state to exclude a prospective juror on the basis of race. The record demonstrates that Gatewood is a black man. When the state exercised its second peremptory challenge to excuse a prospective juror, Gatewood's counsel asked to approach the bench. An unrecorded discussion took place in the trial court's chambers. After the jury was chosen, the trial court placed the following on the record:
 After the State used their [sic] second peremptory challenge to excuse Brian Green, we had a sidebar, actually went in chambers.
 [Defense counsel] indicated that he was going to make at that time a Batson challenge. Mr. Green is black.
 I indicated at that time that there was no pattern. The State had some reasons for tossing him off anyway. I think the reason stated was he had a number of jobs in the very recent future — or recent past and appeared to be unstable. It does not rise to a pattern because he is the only African-American or black thrown off the jury by the State using their peremptory challenges.
 Counsel for both sides stated that the trial court's comments accurately reflected what had occurred in chambers.
The United States Supreme Court has established a three-part test to be used in evaluating a claim of racial discrimination in the exercise of a peremptory challenge.[11] In this case, Gatewood had the burden to make a prima facie showing that the state had exercised its peremptory challenge to exclude Green because of his race. The state then had the burden of production "to come forward with a race-neutral explanation."[12] Last, the trial court had to "determine whether, under all the circumstances, [Gatewood] ha[d] proven purposeful racial discrimination."[13]
The determination of whether there was a discriminatory motive in exercising a peremptory challenge will not be reversed on appeal absent a conclusion that it was clearly erroneous.[14]
A "clearly erroneous" decision is one in which a reviewing court "is left with a definite and firm conviction that the trial court made a mistake* * *."[15]
On review, our concern is "whether the trial court's finding of no racial motive is fairly supported by the record," with the focus of the review being the genuineness of the race-neutral explanation, and not its reasonableness.[16]
We assume for the sake of argument only that Gatewood made a prima facie case of purposeful discrimination. This assumption is based on the fact that the state gave its reasons for the challenge, and the court ruled on the issue of discrimination. When that occurs, the issue of whether the defendant has made a prima facie case is essentially moot.[17]
The reason given by the state for striking Green as a juror was that he recently had been employed in different jobs and, thus, seemed unstable. During voir dire, Green had stated that he had been employed at his current job for two months and at his previous job for nine months. The prosecutor stated that he believed the job changes indicated instability. The tendered reason was facially race-neutral.
The trial court allowed the peremptory strike to stand. The inquiry at this step of the analysis is "whether, in light of all the circumstances, the state did, in fact, have a discriminatory motive in striking the juror."[18] In this case, the trial court made the decision, at least implicitly, that there was no discriminatory motive. It looked at the reason presented and the fact that there was no pattern of striking African-Americans. While the fact that no pattern of discrimination exists cannot be a race-neutral reason under the second step of the analysis,[19] it is a fact the trial court may consider that "point[s] away from a racial motivation."[20] We cannot say from the record before us that the trial court's decision was clearly erroneous.
IV. The Sufficiency and Weight Issues are Really a Verdict Problem
In his fourth and sixth assignments, Gatewood challenges the sufficiency of the evidence supporting his conviction for failure to comply with a police officer's signal while operating a motor vehicle. In his fifth assignment, he challenges the weight of the evidence supporting that conviction. Specifically, he argues that because the jury was never told that he had pleaded guilty to preparing marijuana for distribution, the element of fleeing after the commission of a felony was not proved. The jury was only told about a stipulation that Gatewood had possessed a small amount of marijuana (which would be a misdemeanor), but that stipulation was irrelevant to any issue in the trial.
Gatewood's argument lacks merit because the jury was instructed that the felony to be considered in determining whether Gatewood was guilty for failure to comply with a police officer's order was that alleged inthe felonious-assault charge. Both counsel concentrated on that issue, evidently assuming that the jury would find Gatewood guilty of felonious assault — a verdict that would certainly have been justified by the evidence. But the jury acquitted Gatewood of that charge.
The sufficiency-of-the-evidence challenge in Gatewood's fourth assignment requires us to examine the evidence presented at trial and to determine whether that evidence, when viewed in a light most favorable to the state, could have convinced any rational trier of fact beyond a reasonable doubt that Gatewood had operated his vehicle to elude a police officer after receiving a visible or audible signal from the officer to stop his vehicle, and that the violation had occurred while Gatewood was fleeing immediately after committing a felony, or that Gatewood's operation of his car had caused a substantial risk of serious physical harm to person or property.[21] Similarly, in addressing Gatewood's sixth assignment, the trial court's denial of his Crim.R. 29 motion, we must determine whether the evidence was "such that reasonable minds [could have] reach[ed] different conclusions" as to whether the state had proved each material element beyond a reasonable doubt.[22] To reverse on a manifest-weight-of-the-evidence claim, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine that the factfinder "lost its way."[23]
We conclude that the evidence was sufficient under the above standards to support a finding either that Gatewood had fled after committing the felony of felonious assault or that his operation of his car had created a substantial risk of serious harm to persons or property. Further a finding of guilt on either element was not against the manifest weight of the evidence. Thus, we uphold the jury's guilty verdicts.
A problem arises, however, because the jury did not find Gatewood guilty of felonious assault. Without a finding of guilt on the felonious-assault charge, Gatewood could not have been found guilty of ignoring the signal of a police officer while fleeing immediately after committing a felony. The record does, however, support a finding that Gatewood had operated his vehicle so as to create a substantial risk of serious physical harm. Unfortunately, the jury verdict does not specify which of the two aggravating factors was found to apply, and the trial court imposed a sentence as if Gatewood had been convicted of the felonious-assault element-the one element not supported by the jury's verdict acquitting Gatewood of felonious assault. We conclude that the jury failed to make a specific finding on the requisite aggravating factor.
This case is unique in that the jury verdict and the trial court's sentence for failing to comply with an order or signal of a police officer while operating a vehicle are inconsistent. The indictment states in count two,
 The Grand Jurors of the County of Hamilton, in the name and by the authority of the State of Ohio, upon their oaths do find and present that Damon Gatewood, on or about the 15th day of February in the year Nineteen Hundred and Ninety-Nine at the county of Hamilton and the state of Ohio aforesaid, willfully operated a motor vehicle so as to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring his motor vehicle to a stop, and in committing such an offense the defendant was fleeing immediately after the commission of a felony and/or the operation of the motor vehicle by the defendant caused a substantial risk of serious physical harm to persons or property
in violation of Section 2921.331(B) of the Revised Code and against the peace and dignity of the State of Ohio.
The verdict form states, "We the jury in the above captioned case do hereby find the defendant, Damon Gatewwod [sic] guilty of the offense of Failure to Comply with an Order or Signal of Police Officer, as charged in Count 1 of the Indictment." After Gatewood had pleaded no contest to preparation of marijuana for sale, count one in the indictment, the trial court prepared the verdict forms and instructed the jury as if count two had been renumbered as count one. No amended indictment was filed.
The charge to the jury reads as follows:
 Count 1, failure to comply with an order or signal of a police officer. The defendant is charged with failing to comply with an order or signal of a police officer.
 Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 15th day of February 1999, and in Hamilton County, Ohio, the defendant operated a motor vehicle so as to willfully — or so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring his motor vehicle to a stop, and in committing such an offense the defendant was fleeing immediately after the commission of a felony and/or the operation of a motor vehicle by the defendant caused a serious risk [sic] of serious physical harm to persons or property
 The trial court continued, "It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to flee immediately after the commission of a felony and/or to operate the motor vehicle so as to cause a substantial risk of serious physical harm to persons or property." The court then instructed the jury that the felony to be considered was felonious assault and defined several words and phrases, including "substantial risk" and "serious physical harm." After the jury rendered its guilty verdict, the trial court sentenced Gatewood on a fourth-degree felony.
The failure to obey a signal or order of a police officer while operating a motor vehicle is a first-degree misdemeanor unless the jury finds that the defendant either (1) was fleeing immediately after committing a felony — which elevates the crime to a fourth-degree felony or (2) caused a substantial risk of serious harm — which makes it a third- degree felony.
The aggravating factors that elevated the degree of the offense were substantive elements that had to be proved beyond a reasonable doubt by the state. If the state had proved, and the jury found, that Gatewood was guilty of fleeing immediately after the commission of a felony, he would have been guilty of a fourth-degree felony. If the state had proved, and the jury found, that Gatewood's operation of his vehicle caused a substantial risk of serious harm, he would have been guilty of a third-degree felony. If the jury made no finding as to either of the factors, his failure to obey a signal of a police officer under R.C.2921.331(B) was a first-degree misdemeanor.
R.C. 2945.75(A)(1) provides that where an additional element makes an offense one of a more serious degree, the indictment must state the degree of the offense or allege the additional elements. Similarly, under R.C. 2945.75(A)(2), a guilty verdict must state the degree of the offense of which the offender is found guilty or that the additional elements are present. If either of these provisions is violated, the defendant may only be found guilty of the least degree of the offense. Generally, substantial compliance with the statute is required.
In State v. Woods,[24] the court explained that reversible error did not result from a failure to strictly comply with R.C. 2945.75(A)(2) where "the verdicts incorporate the language of the indictments, the evidence overwhelmingly shows the presence of the aggravating circumstances, and defendants never objected at trial to the form of the verdict." One court has stated that this holding may be "interpreted to impede reversal where the verdict forms state `as charged in the indictment'; the indictment expressly sets forth the elements of the greater offense; and the trial court reads the indictment to the jury."[25]
It is the state's duty to point out any problem in this situation because such a defect results in a lesser punishment. "A defendant * * * has no duty to ask the state to charge him with a more serious crime or to mete out greater punishment. It is the state's responsibility, and not the defendant's, to call to the court's attention errors which prejudice the state."[26]
In this case, the indictment provided for alternative aggravating factors in a single count and failed to state the degree of the offense. There may be times where providing alternative factors in a single count and submitting a verdict form that states that the defendant is guilty of the offense as charged in the indictment do not create a problem. But the procedure does pose a problem in this case where the alternative aggravating factors constituted different degrees of felony.
The verdict form did not allow the jury to make a finding as to a specific aggravating factor. Without knowing exactly what aggravating factor, if any, the jury found to exist, the trial court "guessed" and sentenced Gatewood for a fourth-degree felony. Clearly, if the jury had indicated that Gatewood was guilty of failing to obey a signal or order while fleeing immediately after committing a felony after it had acquitted him of felonious assault, the verdict would have been erroneous. (In this case, the jury found Gatewood guilty of negligent assault, a third-degree misdemeanor.) Further the parties entered into what appears to be an irrelevant stipulation, which was read to the jury. The stipulation stated that Gatewood possessed .6 grams of marijuana at the moment he was at Warsaw and Grand. It was at that point that Gatewood allegedly began to flee from the police. It is possible that the jury may have thought that the offense referred to in the stipulation was a felony. Arguably, the trial court believed that the jury had found that Gatewood had failed to comply with a signal from a police officer while fleeing immediately after committing a felony, because it sentenced him to a fourth-degree felony. Further, the record fails to demonstrate that the evidence as to either aggravating factor was overwhelming. (Of course, Gatewood had actually pleaded no contest to a felony, preparation of marijuana for sale in violation of R.C.2925.07(A), but the stipulation did not apprise the jury of this fact. If Gatewood had stipulated to a felony, it is difficult to believe that this case would have ended up in the strange posture we see today.)
We hold that the wording of the verdict form and the indictment in this case gave rise to reversible error that resulted in an erroneous sentence.[27] On the state of the record, the jury's verdict may only constitute a guilty finding for the least degree of a violation under R.C. 2921.331(B). Therefore, we must vacate that portion of the trial court's judgment and sentence convicting Gatewood of a fourth-degree felony for violating R.C. 2921.331(B), and order that he be sentenced for a first-degree-misdemeanor violation of that statute.
As a result of our conclusion that Gatewood should be sentenced on a misdemeanor violation, we must also vacate that portion of the trial court's judgment ordering that the sentence for the failure to obey an order or signal of a police officer be served consecutively to Gatewood's felony sentence for preparing marijuana for sale. Under R.C. 2929.41(A), the misdemeanor sentence must be served concurrently with the felony sentence.
V. Another Sentencing Problem
Even though we have concluded that the sentence for the misdemeanor violation of R.C. 2921.331(B) must be served concurrently with the prison term imposed for Gatewood's felony conviction, we are concerned with the procedure used by the trial court in its initial imposition of consecutive sentences. We find unacceptable the Monday-morning quarterbacking that took place in the sentencing phase of this case.
The trial court conducted a sentencing hearing on Friday, February 4, 2000, with Gatewood present, and set the terms of Gatewood's sentence. The judgment entry containing the sentence was entered the same day. On Monday, February 7, 2000, the trial court had a "hearing" on the record, without Gatewood being present, and attempted to comply with R.C.2929.14(E) by stating its reasons for imposing consecutive sentences. The reasons the trial court gave were that the harm was unusual because shots had been fired (by the police) and general alarm had been caused. The trial court also stated that consecutive sentences were warranted because Gatewood had a history of police chases, and that consecutive sentences were necessary to fulfill the purposes of R.C. 2929.11.
While our disposition of this case and the fact that consecutive sentences are mandatory for a felony conviction under R.C. 2929.31 make the trial court's conduct irrelevant in this case; it would not be so under other facts. The trial court's findings and reasons were provided after the imposition of consecutive sentences. The sentencing statutes provide that the required findings and reasons be placed on the record at sentencing, not by an after-the-fact procedure that arguably violates a defendant's right to be present at every critical stage of his or her trial. If this were a case that had required such findings and reasons, we would have concluded that the trial court erred by failing to make the requisite predicate findings until after it had imposed consecutive sentences.[28]
 VI. Conclusion
Therefore, we affirm the findings of guilt with one modification in respect to the degree of the failure-to- comply offense, which must be considered a first-degree misdemeanor, vacate the sentence imposed for failing to comply with an order or signal of a police officer while operating a vehicle, and remand this case with instructions for the trial court to impose a sentence appropriate for a first-degree misdemeanor, to be served concurrently with Gatewood's felony sentence.
Sundermann and Shannon, JJ., concur.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.
[1] See Terry v. Ohio (1968), 392 U.S. 1, 21, 88 S.Ct. 1868,1880.
[2] See Florida v. J.L. (2000), 529 U.S. 266, 120 S.Ct. 1375,1379.
[3] See State v. Pauley (Jan. 30, 1998), Montgomery App. No. 16231, unreported.
[4] State v. Ramey (1998), 129 Ohio App.3d 409, 414, 717 N.E.2d 1153,1156.
[5] See Maumee v. Weisner (1999), 87 Ohio St.3d 295, 299, 720 N.E.2d 507,512.
[6] See id.
[7] See id at 300, 720 N.E.2d at 513.
[8] Accord State v. Ramey (1998), 129 Ohio App.3d 409,717 N.E.2d 1153.
[9] See Maumee v. Weisner at 302, 720 N.E.2d at 514.
[10] See Maumee v. Weisner at 302, 720 N.E.2d at 514-515.
[11] See Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712.
[12] See State v. Walker (Sept. 1, 2000), Hamilton App. No. C-980849, unreported, citing Batson v. Kentucky at 96-98,106 S.Ct. at 1722-1723.
[13] See State v. White (1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140,147, certiorari denied (1999), 528 U.S. 938, 120 S.Ct. 345.
[14] See Hernandez v. New York (1991), 500 U.S. 352, 369,111 S.Ct. 1859, 1871.
[15] See State v. McClaney (June 30, 2000), Franklin App. No. 99AP-1035, unreported, citing Hernandez v. New York, supra, at 369,111 S.Ct. at 1871.
[16] State v. McClaney, supra, citing Purkett v. Elem (1995),514 U.S. 765, 768, 115 S.Ct. 1769, 1771.
[17] See State v. White, supra, at 437, 709 N.E.2d at 148.
[18] See id. at 437, 709 N.E.2d at 148.
[19] See State v. Walker, supra.
[20] See State v. White, supra, at 437, 709 N.E.2d at 148.
[21] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[22] See State v. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.
[23] See State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720-721.
[24] State v. Woods (1982), 8 Ohio App.3d 56, 63, 455 N.E.2d 1289,1298.
[25] See State v. Mitchell (Dec. 5, 1996), Cuyahoga App. No. 67490, unreported, citing State v. Pusey (July 11, 1991), Shelby App. No. 17-90-1, unreported.
[26] See State v. Gleason (1996), 110 Ohio App.3d 240, 248,673 N.E.2d 985, 991, citing State v. Breaston (1993), 83 Ohio App.3d 410,413, 614 N.E.2d 1156, 1158.
[27] Accord State v. Burrow (Nov. 9, 2000), Hamilton App. No. C-000043, unreported; State v. Bost (Nov. 28, 2000), Franklin App. No. 00AP-506, unreported
[28] See State v. Riggs (Oct. 11, 2000), Summit App. No. 19846, unreported (Whitmore, J., concurring in part and dissenting in part).