OPINION
James Jordan ("Jordan") appeals from a judgment of the Montgomery County Court of Common Pleas, which denied his motions to suppress and, following a jury verdict finding him guilty, found that he was a repeat violent offender and sentenced him accordingly.
The state's evidence established the following facts.
Jordan arrived at Hook's Bar-B-Cue shortly before midnight on January 7, 2000. He began flirting with the cashier, Keonna Estridge ("Estridge"), and insisted upon giving her his beeper number. After learning her name from some of the customers, he began yelling for her to "come here." Estridge went to get Shirley Hooks ("Hooks"), a co-owner of the restaurant, to diffuse the situation. When Hooks attempted to calm Jordan down, he hurled obscenities and insults at her. Eventually, Hooks' son Anthony ("Tony") intervened and punched Jordan. Hooks broke up the fight and asked Jordan to leave and not to come back. At this point, Jordan left temporarily.
Jordan returned to the restaurant approximately ten minutes later, while Estridge, Hooks, and Tony were in the office. They heard him yell, "You all mother fuckers, come on out here. I'm out here now. I'm out here now. Goddamn it. You all mother fuckers scared? Yeah, you all got to leave, mother fuckers, sometime." He said he would be across the street waiting to shoot them when they came out. At this point, Hooks called the police and her husband, who came to the restaurant immediately with a gun.
After Jordan left the restaurant the second time and the police were called, Estridge and Hooks went back to work. Jordan then returned to the restaurant a third time, pulled a gun from his pants, and shot at Estridge, who ducked and ran to the back of the restaurant. Jordan then shot Hooks, who was hit in the chest and killed. When Hooks' husband arrived, he and Tony exchanged fire with Jordan, who then fled across the street toward a bar.
Minutes later, Officers DeBorde and Bowling of the Dayton Police Department responded to a dispatch reporting that "there was a disturbance with a possible weapon involved" at Hook's Bar-B-Cue. Through their in-car computer, they learned that a black man in a black and white plaid jacket had been asked to leave the restaurant and that the man had said he would be waiting across the street with a gun. The dispatch also described a maroon pickup truck with a license plate reading "SONJA P." Officers DeBorde and Bowling arrived at the restaurant to see "people running in all directions" and "running and ducking behind cars." In the midst of this scene, an unidentified black man ran up to them and said, "They're shooting up the place, there's blood everywhere, he ran across the street, there he goes." The man pointed at a gray car pulling out of the bar across the street.
The officers immediately turned around and followed the gray car for a few blocks, at which time they stopped it. They turned on their spotlight, which illuminated the inside of the gray car, revealing a black man wearing a black and white plaid jacket. Officers DeBorde and Bowling approached with guns drawn and ordered the man to exit the vehicle. They patted him down, handcuffed him, and placed him in the back of their cruiser. Upon being asked, he identified himself as James Jordan. Officer Bowling then searched the vehicle, finding first a steak knife in the back door, then a gun under the passenger seat. He left the weapons in the vehicle, and he and Officer DeBorde transported Jordan to the Safety Building in downtown Dayton. At some point, the officers were informed on their radio that there had been a shooting at Hook's Bar-B-Cue, although it is unclear whether it was before or after the search.
After Jordan had been transported to the Safety Building, Detective Elzholz of the Dayton Police Department was directed to construct a photo spread containing Jordan's photograph. To that end, Detective Elzholz took a Polaroid photograph of Jordan and placed it in the fifth position in a photo spread using Polaroids of five other individuals who matched Jordan's general description. Each eyewitness was then taken into the room separately and read instructions regarding the photo identification. They were each shown the spread and, if they identified a suspect, asked to sign and date the back. Detective Elzholz took steps to keep the witnesses from seeing the other signatures at all times. Furthermore, the witnesses were separated and told not to speak to one another from just minutes after the shooting until after they had given statements and seen the photo spread. Seven of the eleven witnesses identified Jordan as the shooter, while four could not make an identification at all. It is undisputed that Jordan's picture was the only one showing an individual with braids in a black and white plaid jacket.
A grand jury indicted Jordan on March 7, 2000 on two counts of aggravated murder, one count of murder, three counts of felonious assault, one count of aggravated burglary, three counts of having a weapon while under a disability, and one count of carrying a concealed weapon. The aggravated murder, murder, and felonious assault charges were accompanied by firearm specifications and repeat violent offender specifications. Jordan filed motions to suppress the identifications resulting from the photo spread and the evidence gained from the stop and search of his vehicle. The trial court overruled these motions on June 5, 2000. Jordan waived his right to a jury trial on the charges of having a weapon while under a disability and on the repeat violent offender specifications. A jury found Jordan guilty on all counts except one count of felonious assault, and the trial court found him guilty of two counts of having a weapon under a disability.
The trial court sentenced Jordan on November 15, 2000. Jordan was sentenced to imprisonment of twenty years to life for aggravated murder, eight years for each of the felonious assault convictions, nine years for aggravated burglary, five years for having a weapon while under a disability, eighteen months for carrying a concealed weapon, and three years for the firearm specifications. The court ordered that the above sentences be served consecutively. The court also found that Jordan was a repeat violent offender and sentenced him to an additional ten years for each of these specifications, to be served concurrently with each other but consecutive to the rest of the sentence.
Jordan raises three assignments of error on appeal.
 THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE FOUND DURING THE WARRANTLESS SEIZURE AND SEARCH OF DEFENDANT'S VEHICLE.
Under this assignment of error, Jordan argues first that the police did not have reasonable suspicion to justify the stop of his vehicle and second that the police did not have probable cause to arrest Jordan and search his vehicle. We will deal with his arguments in that order.
Initially, we note that the following standard governs our review of a trial court's decision regarding a motion to suppress:
 [W]e are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.
State v. Retherford (1994), 93 Ohio App.3d 586, 592.
Both sides agree that the appropriate test for determining the constitutionality of the stop of Jordan's vehicle is set forth in Terryv. Ohio (1968), 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, which allows police officers to stop motorists to investigate a reasonable suspicion of criminal activity. Under Terry, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry,88 S.Ct. at 1880. Analyzing whether the police had reasonable suspicion in any given situation requires us to review the "totality of the circumstances." Maumee v. Weisner (1999), 87 Ohio St.3d 295, 299, citingUnited States v. Cortez (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 695.
In the case before us, whether Officers DeBorde and Bowling had reasonable suspicion turns largely on the reliability of the "informant" who approached the officers and alerted them that the suspect was leaving in the gray car. The Supreme Court of Ohio noted in Weisner that informants usually fit into one of three categories: "the anonymous informant, the known informant (someone from the criminal world who has provided previous reliable tips), and the identified citizen informant."Weisner, 87 Ohio St.3d at 300. In this hierarchy of informants, the identified citizen informant is the most reliable, while the anonymous informant is the least reliable, requiring independent police corroboration. See id. Jordan argues that the unidentified citizen informant who pointed the officers to the gray car should be considered an anonymous informant, requiring the police to independently corroborate the information. The trial court found that the informant fell somewhere between the classifications set forth in Weisner, but that there were sufficient indicia of reliability to justify the stop.
We agree with the trial court's determination. The Supreme Court of Ohio made clear in Weisner that ordinary citizen informants who do not happen to give a name should not be treated like anonymous informants.Id. at 300-02. Indeed, this court has previously stated that "[i]nformation from an ordinary citizen who has personally observed what appears to be criminal conduct carries with it indicia of reliability and is presumed to be reliable." State v. Carstensen (Dec. 18, 1991), Miami App. No. 91-CA-13, unreported, at *2. The First District Court of Appeals held that an unidentified informant who stops an officer to provide information about a crime is not anonymous: "There is nothing even remotely anonymous, clandestine, or surreptitious about a citizen stopping a police officer on the street to report criminal activity."State v. Ramey (1998), 129 Ohio App.3d 409, 416.
We agree with the First District. A citizen who flags down a police officer to report criminal activity is not "anonymous" under the three classifications of informants. There is nothing in the record to suggest that the man who pointed police to the gray car would have refused to give his name if asked or that he attempted to conceal his identity in any way. Whether an informant is "anonymous" depends on whether the informant himself took steps to maintain anonymity, not on whether the police had time to get his name. Thus, the "informant" in this case should be treated more like an identified citizen informant, requiring the police to show less independent corroboration. However, we emphasize that the informant's reliability must still be viewed within the totality of the circumstances to determine if the police had reasonable suspicion to stop Jordan's vehicle.
We conclude that the police had reasonable suspicion to stop Jordan. Officers DeBorde and Bowling had received a dispatch that there had been a disturbance with a weapon at Hook's Bar-B-Cue and that the suspect, a black male wearing a black and white plaid jacket, would be waiting across the street with a gun. Upon arriving minutes after the dispatch, they saw a scene of chaos, with people running and ducking. They were immediately approached by an apparently frightened individual who told them that there had been a shooting (which the chaotic scene supported) and that the perpetrator was in the gray car across the street (where the dispatch had said the man would be). This was sufficient information to create a reasonable suspicion in the officers that the occupant of the gray car had been in some way involved in criminal activity. The stop of Jordan's vehicle was therefore justified under Terry.
Jordan's second contention under this assignment of error is that the police did not have probable cause to arrest Jordan or to search his vehicle. Warrantless arrests are not valid unless they are supported by probable cause, which requires that the facts and circumstances within the arresting officer's knowledge are such that a reasonable person would believe that the suspect had committed a crime. See Beck v. Ohio (1964),379 U.S. 89, 91, 85 S.Ct. 223, 225; Huber v. O'Neill (1981),66 Ohio St.2d 28, 30. The existence of probable cause is determined by looking at the totality of the circumstances. See Illinois v. Gates
(1983), 462 U.S. 213, 230-32, 103 S.Ct. 2317, 2328-29.
In Jordan's case, the same facts that justified the stop of his vehicle gave the officers probable cause to arrest him. They had information of a disturbance in which a black man in a black and white plaid jacket had threatened to be waiting across the street with a gun. They arrived at the restaurant minutes later to see people running from the restaurant and ducking. They were then informed by a frightened eyewitness that there had been a shooting and that the shooter was pulling out of the parking lot across the street in a gray car. In addition, upon shining a spotlight into Jordan's car, the officers could see a black male with a black and white plaid jacket, fitting the description they had received.[1] All of this information was sufficient to cause the officers to believe that Jordan had been involved in a crime, giving them probable cause to arrest him.
The officers were also justified in searching Jordan's vehicle. Under the "automobile exception" to the Fourth Amendment's warrant requirement, the police may search an automobile if they have probable cause to believe it contains evidence and there are exigent circumstances justifying a warrantless search. See State v. Mills (1992),62 Ohio St.3d 357, 367; Carroll v. United States (1925), 267 U.S. 132,45 S.Ct. 280. This court has repeatedly recognized the "inherent mobility" of automobiles, such that exigent circumstances typically exist if the vehicle was readily mobile at the time of the stop. See Mills, supra, at 367; State v. Cracraft (Dec. 29, 1995), Montgomery App. No. 14809, unreported, at *4; State v. Snyder (Aug. 10, 1994), Montgomery App. No. 14089, unreported, at *7; see also California v. Carney (1985),471 U.S. 386, 392-93, 105 S.Ct. 2066, 2069-70. The immobilization of the vehicle or low probability of its being moved or evidence being destroyed does not remove the officers' justification to conduct a search pursuant to the automobile exception. See United States v. Chadwick (1977),433 U.S. 1, 12, 97 S.Ct. 2476, 2484; Michigan v. Thomas (1982),458 U.S. 259, 261, 102 S.Ct. 3079, 3080-81. Therefore, whether the officers' search of Jordan's car was valid turns solely on the issue of probable cause.
The same facts that gave the officers probable cause to arrest Jordan gave them probable cause to search his vehicle. In addition, he was suspected of having a gun, but one was not found on him during the officers' pat down. This, combined with all the facts previously discussed, was sufficient to give the officers probable cause to believe that they would find a gun or other evidence of a crime in the vehicle.
For the foregoing reasons, we find that the trial court did not err in overruling Jordan's motion to suppress.
The first assignment of error is overruled.
 THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS THE OUT OF COURT PHOTO SPREAD IDENTIFICATIONS.
Jordan's second assignment of error addresses the validity of the photo spread that was shown to eyewitnesses for the purpose of identifying the suspect in the shooting. He argues that the spread was unnecessarily suggestive because his was the only picture of a man with braids wearing a black and white plaid jacket.
We do not think that this photo spread was impermissibly suggestive. However, even assuming that it was, there is not a per se violation of due process. Rather, we must consider whether it was so suggestive that any identification arising from it is unreliable due to a substantial likelihood of misidentification. The United States Supreme Court has articulated the appropriate inquiry:
 [R]eliability is the linchpin in determining the admissibility of identification testimony[.] * * * The factors to be considered * * * include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
Manson v. Brathwaite (1977), 432 U.S. 98, 114, 97 S.Ct. 2243, 2253.
Two eyewitnesses testified at the hearing on Jordan's motions to suppress-Estridge and Veronica Chancellor. Both women were employees of the restaurant and were able to view Jordan during the confrontation that occurred when he first entered the restaurant. Estridge even had a conversation with Jordan during which he insisted that she take his phone number. Both women were likely to be paying a great deal of attention to Jordan as he engaged in a confrontation the first time he was in the restaurant and later returned to shoot at them. In addition, the identification was made only an hour following the shooting, and Detective Elzholz testified that both women identified Jordan quickly and with certainty.
Furthermore, both women looked to traits other than Jordan's hair and jacket. Estridge testified that she was not looking at the clothing because she thought it would be an old picture. Furthermore, she testified that the hair of one of the men looked similar to Jordan's. Most importantly, she stated that she was looking at his nose, the way his lips were shaped, and his eyebrows. Chancellor was looking for hairstyle and clothing, but testified that she identified Jordan based on his face and his facial expression. Therefore, under Manson, these identifications were reliable despite any undue suggestion created by the fact that Jordan was the only individual with braids or a black and white plaid jacket. Thus, we find that the trial court did not err in overruling Jordan's motion to suppress the identifications resulting from the photo spread.
The second assignment of error is overruled.
 THE TRIAL COURT ERRED BY FINDING THE DEFENDANT WAS A REPEAT VIOLENT OFFENDER AS DEFINED BY R.C. 2929.01(EE).
Under this assignment of error, Jordan argues that the trial court erred in finding that he was a repeat violent offender under R.C.2929.01(DD) (formerly (EE)) and sentencing him to an additional ten years as a result.
R.C. 2929.01(DD) provides:
 "Repeat violent offender" means a person about whom both of the following apply:
 (1) The person has been convicted of or has pleaded guilty to, and is being sentenced for committing, for complicity in committing, or for an attempt to commit, aggravated murder, murder, involuntary manslaughter, a felony of the first degree other than one set forth in Chapter 2925. of the Revised Code, a felony of the first degree set forth in Chapter 2925. of the Revised Code that involved an attempt to cause serious physical harm to a person or that resulted in serious physical harm to a person, or a felony of the second degree that involved an attempt to cause serious physical harm to a person or that resulted in serious physical harm to a person.
(2) Either of the following applies:
 (a) The person previously was convicted of or pleaded guilty to, and served a prison term for, any of the following:
 (i) Aggravated murder, murder, involuntary manslaughter, rape, felonious sexual penetration * * *, a felony of the first or second degree that resulted in the death of a person or in physical harm to a person, or complicity in or an attempt to commit any of those offenses.
It is undisputed that the first prong of this definition is met with respect to Jordan. The issue is therefore confined to whether the second prong is met.
Jordan argues that the second prong requires the prosecution to prove beyond a reasonable doubt that the prior convictions "resulted in the death of a person or in physical harm to a person." To support this contention, he cites to Apprendi v. New Jersey (2000), 530 U.S. 466,489, 120 S.Ct. 2348, 2362-63, which held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The state argues that Apprendi is inapplicable to R.C. 2929.01 and that Almendarez-Torres v. United States
(1998), 523 U.S. 224, 118 S.Ct. 1219, provides the applicable law. The distinction between these two cases lies in whether the state is required to prove anything more than a prior conviction. If the state is only required to prove a prior conviction, the prior conviction is a sentencing factor, which must only be established by a preponderance of the evidence under Almendarez-Torres. If the prosecution is required to prove something "other than the fact of a prior conviction," that fact must be proved beyond a reasonable doubt under Apprendi. While we believe that R.C. 2929.01(DD) is more similar to the statute at issue inAlmendarez-Torres than the one in Apprendi, we conclude that the state met its burden of proof under either standard.
The state argued below that the language of R.C. 2929.01(DD)(2)(a)(ii) did not require them to show that Jordan's prior conviction actually resulted in physical harm. Rather, the state contends that the language "or complicity in or an attempt to commit any of those offenses" means that an attempt to commit a first or second degree felony that would result in physical harm to a person if completed is sufficient. To this end, the state produced evidence of Jordan's prior conviction for felonious assault. The indictment stated that Jordan "did knowingly cause or attempt to cause physical harm to another, to wit: Willie W. Johnson, by means of a deadly weapon, to-wit: a handgun." Further, the state produced evidence that Jordan had pleaded guilty to the charge. The state argues that Jordan's guilty plea to a charge of causing or attempting to cause physical harm is sufficient because R.C. 2929.01(DD) is met by showing "a felony of the first or second degree that resulted in the death of a person or in physical harm to a person" or by "complicity in or an attempt to commit" such a felony.
The trial court disagreed with the state's statutory construction argument, finding that the state had been required to show physical harm to a person whether the crime was an attempt or a completed crime. In doing so, the court stated that any other reading "would render surplusage the resultant physical harm language." The state argues, and we agree, that the trial court's ruling effectively nullifies the "attempt" language of the statute. Read plainly, the phrase "complicity in or an attempt to commit any of those offenses" refers back to the preceding list of offenses, which includes murder, rape, and first or second degree felonies that result in death or physical harm to a person. Attempted murder would clearly fall within the statute even though it might result in no physical harm. Thus, attempted murder, attempted rape, and an attempt to commit a first or second degree felony that would result in physical harm would all satisfy the statute. Therefore, the state met its burden of proof by introducing evidence of the prior conviction.
Despite its ruling on the state's statutory construction argument, the trial court still found that Jordan was a repeat violent offender. Jordan's felonious assault conviction arose from an incident in which he fired shots at a person who shot back, hitting Jordan in the face, neck, chest, arms, and legs. Thus, the trial court found that the state did show that Jordan's previous offense had resulted in harm, even though that harm had been to Jordan himself. We agree with the trial court's decision that harm to Jordan would satisfy the physical harm "to a person" language of R.C. 2929.01(DD). The legislature's choice of the language "to a person" rather than "to another," which is used in most of the criminal statutes, leads us to believe that it intended to include situations where a defendant's prior first or second degree felony resulted in harm to him. Thus, the harm to Jordan resulting from his act would constitute "physical harm to a person." However, given our ruling that Jordan's attempt to cause physical harm to another is sufficient, it is unnecessary to entirely rest our decision on the harm to Jordan. Thus, the trial court did not err in finding that Jordan was a repeat violent offender under R.C. 2929.01(DD).
The third assignment of error is overruled.
The judgment of the trial court will be affirmed.
FAIN, J. and YOUNG, J., concur.
[1] At some point, the officers also received radio confirmation of a shooting at Hook's Bar-B-Cue. However, as it is unclear whether this was before or after the arrest and subsequent search, we will not consider it as information supporting either.